**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**

**RICHARD H. DARBY and KAY DARBY**                                         **PLAINTIFFS**

**V.**                                                                           **CIVIL ACTION NUMBER: 2:08CV81**

**UNITED STATES OF AMERICA**                                              **DEFENDANTS**

**<u>ORDER</u>**

Plaintiffs Richard and Kay Darby brought this Federal Tort Claims Act ("FTCA") action against the United States seeking to recover for damages suffered as the result of the alleged negligence of a postal employee. The case was tried over two days beginning July 9, 2012, with the court serving as trier of fact. Having considered the testimony of the witnesses at trial, as well as the supporting documentary evidence, the court is now prepared to render its verdict.

This case arises out of an automobile accident which occurred on May 18, 2007 in Sardis, Mississippi. On that date, Shirley Douglas, a United States Postal Service employee, was driving west along East Lee Street and delivering mail to residences along the street. A public sidewalk runs alongside East Lee Street, and plaintiffs' mailbox was located on the east side of a private sidewalk on their property. In her testimony at trial, Douglas conceded that she routinely drove with the right tires of her vehicle on the sidewalk in order to be able to deliver mail to Mr. Darby's residence (and numerous other residences on East Lee Street) without leaving her vehicle. Douglas insisted, however, that on the day of the accident, she deviated from her normal practice and kept her vehicle's tires fully on the road while delivering mail to the Darby residence. In so testifying, Douglas explained that she saw Mr. Darby walking up to receive his mail and that she thus deemed it unnecessary to leave the road to deliver the mail.

1

The exact nature of Douglas' action in this regard were highly disputed at trial, but it is undisputed that, after Darby retrieved his mail, Douglas' postal vehicle was struck from the rear by a 1976 GMC pickup truck operated by John Lewis. Approximately one hour prior to the collision, Lewis had been treated at Tri-Lakes Medical Center for a headache and had received an injection of Nubain and Phenergan, medications which can have a sedative effect. Dr. Robert Smith, the physician for Mr. Lewis, has testified that in his opinion the Nubain and Phenergan were highly likely to interfere with Mr. Lewis' ability to drive and probably caused him to hit the postal vehicle. Lewis' truck overturned during the accident and he was ejected, resulting in his death. The impact of the collision between Lewis' truck and the postal vehicle caused the latter to move forward and to the right, striking Mr. Darby and causing him personal injuries. Darby was taken by ambulance first to Tri-Lakes Medical Center and then airlifted to the Regional Medical Center in Memphis, where he remained until June 6, 2007. He required neurosurgery on his neck with an anterior decompression of the C6-C7 vertebra, removal of the herniated disc, and interbody graft with fusion and plating devices on June 1, 2007. Darby remained in the trauma intensive care unit until four days after his surgery. After leaving the hospital, Darby received home-based physical therapy from June 10 until June 24, and he then received physical therapy from Cornerstone Rehabilitation from June 27 until August 29, 2007. In spite of this treatment, Darby sustained considerable permanent disability which will significantly limit his future activities.

Following the accident, Darby and his wife Kay filed suit in this court against numerous defendants, including the United States, the City of Sardis, and various defendants who were involved in the medical treatment provided to Lewis. However, most of these claims settled

prior to trial, and this court heard evidence at trial relating solely to plaintiffs' FTCA claims against the United States. As always in FTCA cases, this court is serving as the trier of fact, and, having considered the evidence at trial as well as the parties' post-trial submissions, it will presently render its verdict.

### I. Is the United States liable for negligence?

The court first considers the threshold question of whether the proof at trial established that the United States should be held liable for the negligence of its employee Douglas in this case. The liability of the United States under the FTCA is generally determined by reference to state law. *Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992). Because the alleged negligent acts occurred in Mississippi, Mississippi law governs the issue of liability. *Urbach v. United States*, 869 F.2d 829, 831 (5th Cir. 1989). Under Mississippi law, to establish their claims against the United States, plaintiffs were required to prove the following elements by a preponderance of the evidence: (1) a duty to conform to a certain standard of care; (2) a breach of that duty; (3) proximate cause; and (4) resulting damage. *Barner v. Gorman*, 605 So.2d 805, 808–09 (Miss. 1992). In this case, the court is satisfied that plaintiffs established each of the elements of their negligence claim by the requisite preponderance of the evidence.

In the court's view, both sides did an excellent job of presenting their cases at trial, but the objective proof at trial was simply more favorable to plaintiffs than to the government. At trial, most of the testimony related to the issue of whether Ms. Douglas's vehicle was partially on the sidewalk at the time of the accident. The government, through the testimony of Douglas and defense expert witness Brady McMillen, attempted to establish that Douglas' vehicle was

entirely on the street at the time of the accident.

As noted previously, Douglas conceded that it was her normal practice to ride partially on the sidewalk in front of Darby's house, since the positioning of his mailbox would otherwise require her to leave her vehicle in order to deliver the mail. Douglas professed to be unaware of the fact that this practice is contrary to numerous state, local and postal service regulations. Regardless, Douglas maintained that on the day of the accident, she deviated from her normal practice since she observed Mr. Darby in his yard and was thus able to personally hand him his mail without leaving the road. Defendant's accident reconstructionist expert McMillen testified that, in his view, the tire marks and other physical evidence supported Douglas' testimony in this regard. For their part, plaintiffs presented the testimony of Darby and their own expert witness Chris Bloomberg in support of their contention that Douglas' vehicle was partially on the sidewalk at the time of the accident.

The court found the testimony of Darby and Bloomberg to be considerably more credible than that of Douglas and McMillen, based both upon its evaluation of the witnesses themselves and also upon the manner in which their testimony related to the other evidence at trial. As to Douglas, her concession that she normally drove her postal route in a manner which was likely negligent does not assist her in arguing that she did not drive negligently on this particular day. Moreover, defendant's expert McMillen lost credibility with the court when he was forced to alter some of his initial conclusions based upon physical evidence which was presented at trial. McMillen's testimony also failed to adequately account for the undisputed fact that Darby was, in fact, struck by Douglas' vehicle in this case, and no one has suggested that he was walking on the street at the time he was injured.

While these factors are significant, the primary factor supporting the credibility of plaintiffs' version of events is that it was buttressed by objective testimony of eyewitnesses at trial. One such eyewitness was Todd Sellers, who was driving his motorcycle east on East Lee Street at the time of the accident. When asked about the positioning of the postal vehicle, Sellers testified as follows:

> A: He was up on the curb, you know, looked like he was fixing to give him the mail, put the mail in the mail box.
> Q: Okay. The right wheels of the postal truck were where with respect to the sidewalk?
> A: They were just upon on it, the two wheels were upon on the curb.

[T. at 123-124]. Similar testimony was provided by Al Pope, an eyewitness who lived across the street from plaintiff. When asked about the positioning of the postal vehicle's wheels, Pope testified that "two was on the street and two were on the sidewalk." [T. at 130]. Finally, Damon Andrews, a friend of Lewis who was following his vehicle at the time of the accident, testified that:

> A: Well I seen the mail truck there. And I noticed the mail truck was sitting part of it was on the side and part of it was in the road. [T. at 140].

In the court's view, the testimony of these three eyewitnesses, considered together, leaves little doubt that Ms. Douglas' vehicle was, in fact, partially on the sidewalk at the time of the accident in this case.

The positioning of Douglas' vehicle at the time of the accident was the central fact issue at trial, and the court's finding that it was on the sidewalk clearly supports a finding that she acted negligently. It is clear to the court that the location of the postal truck caused it to spin like a whirligig when hit in the left rear by Lewis' vehicle, catching Mr. Darby in its orbit. The parties disagree about the whether the various state, local and federal regulations which prohibit

5

driving on sidewalks should give rise to a finding of negligence *per se*, but the court concludes that this issue is ultimately irrelevant. In the court's view, any reasonable prudent driver should know that streets are intended for vehicles; that sidewalks are intended for pedestrians; and that any incursion upon sidewalks by a vehicle results in a foreseeable risk of injury to pedestrians. The court does not believe that the government seriously disputes this point, particularly considering that it spent most of its trial energy attempting to establish that Ms. Douglas' vehicle was *not* on the sidewalk at the time of the accident. The court accordingly finds that the United States, through its employee Douglas, acted negligently in this case and that this negligence was a proximate cause of Mr. Darby's injuries.

**II. Should the court assign a percentage of fault to Mr. Lewis?**

The court next considers whether Mr. Lewis's actions in driving while under the influence of sedatives and thereupon driving his truck into the rear of Douglas's postal vehicle constituted negligence which was a proximate cause of Darby's injuries in this case. The court finds that this question should clearly be answered in the affirmative, although assigning exact percentages of fault to Lewis and Douglas is a more difficult question. The court has little difficulty, however, in rejecting the government's argument that Lewis' negligence was a superseding cause of the accident in this case which should relieve it of any liability. In *Southland Management Co. v. Brown, ex rel Brown,* 730 So.2d 43 (Miss. 1998), the Mississippi Supreme Court cited the Restatement (Second) of Torts for six factors to be considered in determining whether a particular intervening force can fairly be classified as a superseding cause:

> (a) the fact that its intervention brings about harm different in
> kind from that which would otherwise have resulted from the

6

    actor's negligence;

    (b)     the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

    (c)     the fact that the intervening force is operating independently of any situation created by the actor's negligence, or on the other hand, is or is not a normal result of such a situation;

    (d)     the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

    (e)     the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such, subjects the third person to liability to him; and

    (f)     the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Brown*, 730 So.2d at 46. These factors weigh heavily in support of a conclusion that Lewis' negligence was not a superseding cause of the plaintiff's injuries in this case.

    In the court's view, the possibility that a vehicle might run into the back of Douglas' vehicle and thereby cause injury to pedestrians was not merely *a* foreseeable risk of her negligence, but was, in fact, *the* most foreseeable risk of same. This court finds nothing "extraordinary" about Lewis' negligence in driving his truck into the back of Douglas' vehicle, and it does not view his culpability as being either greater or lesser than that of Douglas. Indeed, there are arguably factors which mitigate the culpability of both Lewis and Douglas in this case and which cause the court to regard their relative fault as being essentially equal. In the case of Lewis, it appears that medication which had been administered to him may have caused him to lose consciousness prior to the accident. If so, this would not excuse his decision to drive so soon after being medicated, but it would distinguish this case from a more egregious fact pattern

where, for example, he had driven after voluntarily becoming intoxicated with alcohol. In the case of Douglas, the positioning of many of the mailboxes along East Lee Street no doubt made it tempting for her to disregard rules against driving partially on the sidewalk, and she clearly gave into this temptation on a regular basis. While it may be understandable, on a human level, that Douglas would have sought to save time and energy by driving or parking partly on the sidewalk, this does not make her actions in this regard any less negligent.

In light of the foregoing, the court concludes 1) that Douglas and Lewis demonstrated a similar degree of negligence in this case, and 2) that the accident in this case would not have happened if either of these two individuals had behaved in a non-negligent manner. Based upon these conclusions, the court finds that the most appropriate verdict is one which allocates fault 50% to Lewis and 50% to the United States, through its employee Douglas. Under Mississippi principles of comparative fault, the United States will therefore be liable for only half of the damages suffered by plaintiffs in this case, and the court will now assess the amount of these damages.

**III. Damages**

**a. Medical and Other Economic Damages**

At trial, defendant did not dispute the medical evidence submitted by plaintiffs, and the court will therefore accept virtually all of their proof and suggested findings of fact in this regard. As noted previously, Darby was taken by ambulance first to Tri-Lakes Medical Center and then airlifted to the Regional Medical Center in Memphis, where he remained until June 6, 2007. He required neurosurgery on his neck with an anterior decompression of the C6-C7

vertebra, removal of the herniated disc, and interbody graft with fusion and plating devices on June 1, 2007. He remained in the trauma intensive care unit until four days after his surgery. Mr. Darby received the following injuries:

1. A displaced and comminuted fracture of the inferior aspect of the glenoid;

2. A mildly displaced and comminuted fracture involving the distal aspect of the clavicle;

3. Bilateral clavicle fracture, with sternal fractures;

4. Left frontal intraparenchymal hemorrhage;

5. Tongue lacerations;

6. Left ear laceration;

7. Numerous rib fractures with extensive emphysema;

8. A small to moderate left pneumothorax and contusion of the left lung;

9. Compression fracture of the mid/upper thoracic vertebral body;

10. Fracture of the pedicle of C6 on the left and the transverse foramina of C6 on the left; and

11. Fracture of the lamina of C5 bilaterally.

After leaving the hospital, Darby received in-home physical therapy from June 10 until June 24. He then received physical therapy from Cornerstone Rehabilitation from June 27 until August 29, 2007. When he came home from the hospital, he required a special air pressure mattress, bed, lift chair, wheelchair, and walker.

As a result of the accident, Mr. Darby has incurred the following medical bills:

1. Mr. Darby received physical therapy from Cornerstone Rehab from June 27 until August 29, 2007. The bill for those services was $4,194.00.

2. When Mr. Darby came home from the hospital, he required a special air pressure mattress, bed, lift chair, a wheel chair, and walker. The bill for the rental of this equipment was $3,595.75.

3. The bill from Tri-Lakes Medical Center for Mr. Darby's treatment totaled $7,089.00.

4. The bill from Batesville Emergency Physicians was $325.00.

5. The bill for the air ambulance from Batesville to The Med was $10,141.00.

6. The charge at The Regional Medical Center at Memphis was $254,870.29.

7. Subsequent bills at The Med for clinic and radiology visits were $1,391.15, $65.52, $396.57, and $355.34.

8. Charges from UT Medical Group, Inc. for physicians and other services were $26,305.00.

9. Charges from Semmes-Murphey Clinic, the neurosurgeons, totaled $18,240.00.

10. Bills from Memphis Radiological, P.C. totaled $1,685.00.

11. Other charges were as follows: Dr. Michael Havens total $13.29; Interventional Radiology Associates of Memphis, P.C. $6,235.00; Rheumatology and Osteoporosis Center of Memphis $1,295.00; Dr. John Marascalco $150.00; Sutherland Cardiology $625.00, pharmacy bills of $1,929.37; charges of Campbell Clinic for orthopaedic services for $2,610.00.

Combined total medical bills amounted to $340,605.91. The court finds that the above medical bills were reasonable and necessary and were incurred as a result of the collision described above. In addition to the above injuries, Mr. Darby lost his watch valued at $375 and his glasses at a cost of $328. As a result of doctor visits and physical therapy, Mr. Darby was required to make more than 20 trips to and from Memphis. He had to hire various individuals to drive him back and forth to doctors' appointments and physical therapy and to help at home and

with his farm. He was also required to use Kenny Jones for transportation from June 27, 2007 through August 29, 2007 for physical therapy each day. In addition, Darby's wife Kay incurred substantial expense during the time that Mr. Darby was hospitalized in Memphis and herself provided numerous services to her husband during the months following his discharge from the hospital. For example, Kay Darby incurred substantial expenses in visiting him at the hospital including mileage and additional amounts in meal expenses of approximately $15 per day for 18 days.

In light of the foregoing, the court finds that Mr. Darby sustained $348,000 in medical and other non-economic damages, and it finds that his wife Kay sustained $4,000 in non-economic damages.

## II. Non-economic damages

At trial, Darby presented what the court found to be highly persuasive evidence regarding the very significant non-economic damages, including pain and suffering, which he and his wife sustained as a result of his injuries. The court accepts the substance of the proof and arguments submitted by plaintiffs in this regard, but, unlike with the economic damages, assigning a dollar value to non-economic damages is an imprecise manner. Accordingly, the court will first discuss the nature of the non-economic damages which were established by plaintiffs in this case, and it will then attempt, as best it can, to assign a dollar value to those damages.

It was clear from the evidence at trial that Darby endured severe pain and suffering as a result of his injuries. When Darby first came home from the hospital, he was unable to do more

than sit in bed and a chair. Physical therapy first consisted of exercising his legs while in bed. Even with therapy, it was a month before Darby could slowly walk around his kitchen table. He has continued trying to exercise himself to keep from losing flexibility. However, he has developed arthritis following these injuries and has significant disability.

     According to his spine surgeon, Dr. Michael Mulbauer, Mr. Darby has, as a result of his neck injury, permanent partial disability of 25% to the body as a whole. For his thoracic fracture, he has a permanent partial disability of 3% to the body as a whole, and his combined disability of the neck and thoracic injuries are 36% to the body as a whole. This does not include his shoulder or pulmonary injuries. As a result of his shoulder injuries, Mr. Darby was treated by Dr. Barney Freeman, an orthopedist. Dr. Freeman testified, and the court finds, that Mr. Darby has a permanent partial disability of 18% to the body as a whole, including 22% to the left upper extremity and 10% to the right upper extremity as a result of the shoulder injuries. These ratings do not include the disability caused by the lung injury. These disability ratings are permanent and are, to a reasonable degree of medical probability, not likely to improve.

     Mr. Darby sustained life-changing injuries as a result of the collision. Prior to the accident, he was in excellent physical condition and had no disabilities. He built his home in Panola County and was active in the Mississippi National Guard until 2005, when he retired as a lieutenant colonel. In the Guard, he was required to pass strenuous physical tests on a yearly basis, and he maintained his fitness after retirement. Mr. Darby is no longer able to do much that he could previously do. He cannot do most of the work that he used to do on his goat farm in Panola County. He was unable to care for his goats and ultimately was forced to dispose of them. He has constant pain and suffering. He can drive only in light traffic due to the inability

to turn his neck fully to see other traffic. He cannot walk long distances.

Darby cannot shop at Wal-mart without pain in his back, neck, and shoulder from walking. He cannot unload goat feed in 50 pounds bags like he could previously. Likewise, he cannot climb up into a deer stand, cannot shoot a shotgun like he could previously, cannot get his gun up to duck hunt, cannot service his tractors, cannot use his arms above his head to do things like hang pictures on the wall, change light bulbs, and the like. He cannot run a garden tiller or do the physical work necessary to have a large garden like he and his wife used to enjoy. He cannot canoe or change a flat tire, and he has pain from riding in a boat because of the rough ride. For two years, he woke up at night in a cold sweat in pain. He uses Flexeril to be able to sleep at night. To put it simply, Mr. Darby's life was drastically changed by this accident.

As a result of the accident, the Darbys' marital relations have been severely affected. Mr. Darby's injuries make it virtually impossible for him to enjoy marital relations, and the Darbys have suffered as a result. Moreover, Mrs. Darby testified persuasively as to the heavy emotional toll that caring for her husband has placed on her and her marriage. Under Mississippi law, a spouse's right of recovery on a loss of consortium claim may include loss of society and companionship, interference with conjugal rights, and damages caused by being forced to provide previously unnecessary physical assistance. *American Nat. Ins. Co. v. Hogue*, 749 So. 2d 1254 (Miss. App. 2000), *citing Tribble v. Gregory*, 288 So. 2d 13, 17 (Miss. 1974). Although she did not suffer physically from the accident in this case, Mrs. Darby's testimony clearly established the requisites of a loss of consortium claim under Mississippi law.

Having discussed the nature of the non-economic damages suffered by Darby and his wife, the court will now attempt to assign a dollar value to it. Doing so is an imprecise matter

13

under the best of circumstances, and this court does not pretend that the dollar figure it arrives at will be the result of any unique insight on its part. Nevertheless, arriving at such a figure is a necessary part of the court's role as trier of fact.

Plaintiffs submit that, consistent with Mississippi's $1 million cap on non-economic damages, the correct assessment of non-economic damages in this case would be $900,000 to Mr. Darby and $100,000 to Mrs. Darby. As to Kay, the court agrees that $100,000 is an appropriate recovery of non-economic damages, and it will therefore award this sum to her. As to Mr. Darby, the court concludes, following careful consideration, that $650,000 is the appropriate award of non-economic damages to him. In so concluding, the court does not regard the $900,000 amount suggested by Mr. Darby as necessarily being unreasonable, but it does find that $650,000 is a figure which better comports with the evidence regarding non-economic damages which was submitted at trial.

## CONCLUSION

In light of the foregoing, the court concludes that the United States, through its employee Douglas, acted negligently in this case and is 50% liable for the injuries sustained by plaintiffs. The court finds that plaintiff Richard Darby suffered $998,000 in total economic and non-economic damages and is therefore entitled to recover $ 499,000 from the United States. The court finds that plaintiff Kay Darby suffered $104,000 in total economic and non-economic damages and is therefore entitled to recover $52,000 from the United States.

14

A separate judgment will be issued this date, pursuant to Fed. R. Civ. P. 58.

THIS the 23rd day of July, 2012.

                                          **/s/ MICHAEL P. MILLS**
                                          **CHIEF JUDGE**
                                          **UNITED STATES DISTRICT COURT**
                                          **NORTHERN DISTRICT OF MISSISSIPPI**